CLERK'S OFFICE
A TRUE COPY
Jul 26, 2021
s/ Daryl Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Prospective Location Data Associated with the Facebook User ID # 100064443150743 | ) ) ) |

Case No. **21 MJ 147**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g); 1073; 2101; 844(n); 844(i); 2118(b); 2118(d) | unlawful possession of a firearm; flight to avoid federal prosecution; interstate travel to carry on a riot; arson of commercial property and conspiracy to commit same; burglary of controlled substances and conspiracy to commit same |

The application is based on these facts:

See the attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF SA Luke Barker
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: __July 26, 2021__

_____
*Judge's signature*

City and state: __Milwaukee, WI__

Hon. William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

<h1 style="text-align:center">AFFIDAVIT IN SUPPORT OF<br>AN APPLICATION FOR A SEARCH WARRANT</h1>

<h2 style="text-align:center">GRAND JURY MATTER NO 2020R00324</h2>

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

<h2 style="text-align:center">INTRODUCTION AND AGENT BACKGROUND</h2>

1.      I make this affidavit in support of an application for search warrant for information associated with Facebook User ID # 100064443150743, more fully described in Attachment A, for evidence, more fully described in Attachment B, of violations of: Title 18, United States Code, Section 922(g) (unlawful possession of a firearm by a prohibited person); Title 18, United States Code, Section 1073 (flight to avoid federal prosecution); Title 18, United States Code, Section 2101 (traveling in interstate commerce to carry on a riot); Title 18, United States Code, Section 844(n) (conspiracy to commit arson); Title 18, United States Code, Section 844(i) (arson of commercial property); Title 18, United States Code, Section 2118(b) (burglary involving controlled substances); and Title 18, United States Code, Section 2118(d) (conspiracy to commit burglary involving controlled substances) (the "Subject Offenses").

2.      I am a Special Agent of the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since November 2015. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.	I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia. I have also completed training at the ATF National Academy. That training included various legal courses related to constitutional law, search and seizure authority, and specific training on explosives and arson investigations.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection. As a Special Agent with the ATF, I have responded to numerous fire scenes and been involved in multiple arson investigations. I have also received additional fire investigation training, including training at the Wisconsin International Association of Arson Investigators' 2019 annual conference. Before joining the ATF, I served for nearly eight years as a police officer with the Aurora Police Department in Aurora, Colorado.

4.	Through my experience and training as a Special Agent, I am aware that social media sites, such as Facebook, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that social media sites, such as Facebook, are often used by witnesses to crimes to record criminal activity.

5.	As an ATF agent, I have been deployed to riots involving arsons. I know from training and experience that individuals who commit crimes during riots commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media, including Facebook.

6.     I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Based on the facts set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of the Subject Offenses. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## FACEBOOK FUNCTIONALITY

9.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code),

telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

11.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device or devices as they interact with the Facebook service on those devices.

13.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

15.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook

users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

21.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.  Based on my training and experience, I know that Facebook can provide real-time and historical location information for the device or devices using a Facebook account, including the date and time associated with a latitude and longitude.

23.     Facebook further maintains a functionality it refers to as "Stories," whereby users can post photos and videos using Facebook's "in app" camera, frequently utilizing filters and additional text.  After a user "posts" a "Story," the "Story" will be available to their "friends" for a 24-hour period, appearing at the top of their "News Feed" in the application.

24.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

25.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further,

Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PROBABLE CAUSE**

27.     On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The ATF subsequently deployed its National Response Team of arson investigators to Kenosha to process the fire scenes, collect video evidence, and identify potential suspects.

*Charlie's Bar*

28.     On August 26, 2020, ATF and the Kenosha Police Department initiated a fire scene investigation at Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin—a building and unit of real property used in an activity affecting interstate commerce.  Investigators located two areas of separate fire damage, one on the outside of the building and one on the inside.  A subsequent Origin and Cause investigation by the ATF determined both fires were "incendiary" in nature.

29.     As part of their investigation, law enforcement collected hours of surveillance videos from multiple locations, including Charlie's 10th Hole bar itself. The following facts are distilled from relevant video surveillance footage reviewed by law enforcement as part of this investigation.

30.     On August 24, 2020, at approximately 11:25 pm, multiple people walked southbound on a sidewalk toward Charlie's 10th Hole bar.  At approximately 11:26 pm, a black male with long dreadlock-style hair wearing a dark sweatshirt with white

lettering (believed to be David GARNER) used an apparent ignitable liquid to set fire to the north exterior of the bar.

31.     At approximately 11:27 pm, this same group of people reacted to an unknown off-camera event by crouching and looking to the southwest.  In response to that same event, a male in the group (believed to be Kevin MARTINEZ), wearing a dark hoodie, light shorts, white shoes, and a light-colored facemask, removed a handgun from his waistband and fired at least two rounds toward the southwest.  The man believed to be MARTINEZ walked with a distinct gait, as his toes pointed outward.

32.     At approximately 11:28:22 pm, a surveillance camera captured images of a male (believed to be Allen KING) wearing shorts, light colored shoes and a graphic t-shirt, standing next to the male believed to be GARNER.  The male believed to be KING also wore gloves and a covering over his head that concealed his face, except his eyes. The covering over his head included a design or graphic near his lower face.

33.     At 11:28:51pm, surveillance cameras captured an illumination near the front window at the bar.  At about this time, the male believed to KING appeared by the front window.  The male believed to be KING was the only subject near the front window at this time.  At approximately 11:28:57pm, interior cameras at the bar captured images of a flaming object flying through the air from the direction of the front window and landing behind the bar.  The male believed to be KING, along with others in his group, subsequently fled westbound across 22nd Avenue toward a CVS located at 3726 22nd Avenue.

*CVS*

34.     Approximately 14 people unlawfully entered the previously mentioned CVS store at approximately 11:30 pm on August 24, 2020.  The unlawful intruders included the man believed to be KING and the man believed to be MARTINEZ.

35.     The Kenosha Police Department responded to the CVS burglary and apprehended a man ("JM") inside the store while other intruders fled.  Upon arrival, officers observed the bottom half of CVS's glass sliding doors were shattered and entered the building to check for subjects. Officers located a silver hammer with a black handle and a flathead screwdriver with a black-and-red handle in the immediate area around JM. Officers noted that cash drawers and pill bottles were strewn across the floor, and the store was in disarray. The pharmacy section of the CVS had hundreds of pill bottles strewn across the floor, one shelf of medication was tipped over, and the medication refrigerators were opened. CVS pharmacy completed an inventory and found that $1,247.53 of controlled substances and $10,821.42 of non-controlled substances were missing from the store.

36.     JM was charged with burglary, in violation of Wisconsin Statute 943.10(1m)(a), the next day in Kenosha County.

37.     JM eventually acknowledged that he had traveled with a group of people from the Twin Cities in Minnesota on August 24, 2020, to participate in "the riots" in Kenosha, Wisconsin. He said that he was standing next to the person who started the fire at Charlie's 10th Hole bar. JM also said there were three vehicles that

traveled together from Minnesota to Kenosha: a Dodge car, a white car, and a dark SUV. JM said he was a passenger in the Dodge car.

38.     Additional surveillance video confirms that a Dodge car, white sedan, and dark SUV parked in the area behind the Stella Hotel in Kenosha on August 24, 2020 at approximately 9:30 pm—consistent with JM's statement. Men believed to be KING and MARTINEZ can be seen exiting the dark SUV. The man believed to be MARTINEZ can be seen donning a black hooded sweatshirt, similar to the one seen on the shooter at Charlie's 10 Hole bar.

### *Citgo*

39.     The Citgo gas station located at 2710 Roosevelt Road, Kenosha, Wisconsin was also burglarized during the early morning hours of August 25, 2020. The following is a summary of images captured by the Citgo surveillance cameras that evening.

40.     During the early morning hours of August 25, 2020, the glass of the Citgo's front windows and door were broken. Multiple people entered the gas station and began to loot.

41.     Shortly thereafter, a dark SUV approached the gas station and a man believed to be KING exited the vehicle, with another individual ("AE"). KING eventually entered the store, possessing what appears to be a handgun.

42.     At one point KING took a shooting stance with both hands on the suspected handgun and aimed it at the office/cashier booth door. Shortly thereafter

most of the other people inside the store suddenly flinched and quickly exited the store. The unidentified people subsequently re-entered the store.

43.     After he placed the handgun in his front pocket, KING then attempted to open the sliding windows to the cashier booth. At about this same time, EU enters the gas station. EU and KING subsequently began working together to force open the cashier window. EU dislodged one of the cashier booth windows, and KING jumped through the window into the cashier booth.

44.     Once inside the cashier booth, KING emptied a garbage can and began placing packs of cigarettes into the can.

45.     By approximately 12:23:05 am, KING had exited the cashier booth with a metal garbage can containing cigarettes.

46.     Shortly thereafter, KING re-entered the gas station and jumped through the cashier window, holding the barrel of a suspected firearm in his right hand. KING subsequently gathered cigarette boxes from the office and carried the boxes into the cashier booth.

47.     At approximately 12:56:59 am, a man believed to be MARTINEZ entered the gas station. MARTINEZ jumped onto the counter and entered the cashier booth. After he jumped into the cashier booth, MARTINEZ assisted in collecting cigarettes.

*Location Evidence*

48.     ATF identified a known cell phone number for GARNER. Cell site location data associated with GARNER's cell phone number revealed that

GARNER's phone travelled to Kenosha from Minnesota on August 24, 2020, returning to Minnesota the next day.

*Other Facebook Evidence*

49.     Law enforcement was eventually able to identify (and obtain records regarding) other Facebook accounts maintained by KING, GARNER and MARTINEZ. In one Facebook post on this other account, created on the date of the suspected arson, KING indicated that he, GARNER and MARTINEZ were on a "money mission." In a "comment" appended to that same posting, KING "tagged" MARTINEZ and wrote: "twin we woke up on mission." MARTINEZ responded: "Factz."

50.     Then, a few minutes later, KING posted a link to a news article related to the officer involved shooting in Kenosha, WI.

51.     KING's next Facebook post was a video on his timeline at approximately 9:52 pm on August 24, 2020, in which he announced that he and his group were in Kenosha, Wisconsin. Law enforcement downloaded this video and observed that it depicted civil unrest. KING himself is depicted wearing a redshirt and a covering over his head and face, consistent with his appearance during the arsons at Charlie's 10th Hole bar.

52.     Later in the video, KING is heard encouraging someone to open a building and start it on fire, but it is unknown if such action was taken. Further along in the video, KING is seen walking next to a man believed to be MARTINEZ.

Near the end of the video, KING is seen walking back towards a black SUV when he is heard repeating an unknown third party's admonition that, "We need to steal so we can start crashing through shit."

53.     During the early morning hours of August 25, 2020, KING shared a video on Facebook depicting a bottle of prescription liquid medicine.  Around that same time, KING sent another video to another Facebook user, which depicted several boxes of cigarettes, cigars, lottery tickets, and other items. In the video, an unknown male states, "We did that."  The recipient of the video asked where KING was located, and KING replied: "Leaving the riot in Wisconsin".

54.     KING sent the same video depicting various consumer items to yet another Facebook user, writing, "Just left Wisconsin riot going back later".  Later that same day, KING sent a photo with listed prices for items believed to be stolen from Kenosha.

55.     In the early morning hours of August 25, 2020, MARTINEZ sent a similar Facebook message to another user:  "Pops I got you On my way! Back from Wisconsin I got a lot of shit I happy Fuccin Cday pops".

56.     On August 25, 2020, GARNER sent similar Facebook messages reading "Omw back to Minneapolis from Wisconsin" and "We just got back from Wisconsin".

57.     That same day, GARNER also sent a Facebook message depicting a prescription pill bottle for Hydrocodone-Acetamin.  The name on the bottle was

"JXXXX BXXXXXX" with a Kenosha, Wisconsin address.  After sending the photo of this prescription pill bottle, GARNER sent an additional message: "Do u know anyone who wants viks".  The Kenosha Police Department confirmed the prescription pill bottle depicted in the previously mentioned image was reported stolen from the CVS pharmacy located at 3726 22nd Avenue on August 24, 2020.

58.     Later that day, GARNER sent additional messages concerning the sale of "some viks" and "red drank" in his possession.

### Indictment & the Subject Account

59.     On July 7, 2021, KING, GARNER and MARTINEZ were indicted in the Eastern District of Wisconsin on various federal charges related to the misconduct described herein.  GARNER and MARTINEZ have been arrested and detained; KING remains at large.

60.     After his indictment, law enforcement located a new Facebook account that KING has frequently used:  "Bullybou Bubba" [Facebook User ID # 100064443150743]. A review of the publicly available photographs and live videos posted on this Facebook account depict a user who appears to be King, based on law enforcement's review of other known photographs of KING.

61.     Since being indicted, KING has made approximately four video posts on this Facebook account, dated from July 13, 2021 to July 19, 2021. In one video, dated July 16, 2021, KING references the pending charges described herein and states that he is upset other individuals are saying he "told on" GARNER and MARTINEZ.  KING

further states that if others continue to claim he served as an informant, he will place a bag on their heads and have them beat. Finally, KING says that unspecified individuals "might see some," at which point KING points what appears to be a handgun at the camera.

62.     KING has multiple prior felony convictions in Hennepin County, Minnesota.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

63.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

64.     Based on the facts set forth in this Affidavit, I submit that there is probable cause to believe that Facebook User ID # 100064443150743 described in Attachment A contains evidence of the Subject Offenses.

65.     I further submit that an expedited production schedule is justified here, given KING's status as a fugitive and the prospect of violence implicated by his recent social media postings.

66.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

### GRAND JURY MATTER NO 2020R00324

This warrant is being sought for the data specified in Attachment B associated with Facebook User ID # 100064443150743 that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

## ATTACHMENT B

### Property to Be Seized

### GRAND JURY MATTER NO 2020R00324

**I.**     **Information to be disclosed by Facebook, Inc. (or the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc., Facebook Inc. is required to disclose to the government, for the User ID listed in Attachment A, all physical location data collected by Facebook Inc. associated with the account, including any data collected by Facebook Inc.'s location services via the user's mobile phone or other device, on a real-time or near-real time basis. Facebook Inc. is required to provide any such data they collect, regardless of the time of day.

**II.**     **Information to be seized by the government**

All data disclosed by the Provider pursuant to this warrant. This data shall be made accessible by the Provider to the US Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) on a continuous basis, day or night, and/or emailed to ATF Special Agent Cory Shelton at cory.shelton@atf.gov, ATF Special Agent Ricky Hankins at ricky.hankins@atf.gov, and ATF Special Agent Luke Barker at luke.barker@atf.gov. These aforementioned recipients are further authorized to share such information with, *inter alia*, the prosecutors and other law enforcement agencies with whom they are working on this matter, including but not limited to Deputies and affiliates of the United States Marshals Service.

### III. Time for production by provider

The Provider shall begin producing the information required by this warrant within three (3) days of the date of service of the warrant.

### IV. Duration of production

The Provider shall produce the information required by this attachment for a period of forty-five (45) days from the date of issuance of this warrant unless notified sooner to cease.